Filed 9/24/25  P. v. Collins CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B338049 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA492874) |
| v. | |
| JUNAR COLLINS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charlaine Olmedo, Judge.  Reversed and remanded.

Jeffrey Manning-Cartwright, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Junar Collins of willful, premeditated, and deliberate murder and of gang conspiracy. On appeal, he raises two claims of instructional error: first, the court failed to instruct the jury that voluntary intoxication can negate premeditation and, second, the court omitted an element of the substantive crime of gang conspiracy. Collins further contends there was insufficient evidence to support his conviction of a gang conspiracy, and the trial court erred in imposing an upper term on a firearm enhancement. We agree that his conviction for gang conspiracy must be reversed and that the trial court erred in imposing the upper term on the firearm enhancement. We therefore reverse the judgment as to count 2 for gang conspiracy and remand for further proceedings and resentencing.

## BACKGROUND

I.     Evidence at Collins's trial

Collins was tried for the murder of Miguel Marquez. The People's theory of the case was that Collins, an 18th Street gang member, shot Marquez to prevent him from testifying against a member of Collins's gang.

A.     *The murder of Miguel Marquez*

In 2020, R.G. owned a restaurant at 76th and Hoover. Wilbur Cruz, an 18th Street gang member, demanded that R.G. pay a quota or fee "for his big homies." On February 12, 2020, R.G. was at the restaurant with Marquez, who worked and lived at the restaurant. Cruz came to the restaurant and demanded money. Cruz shot R.G.'s dog and said R.G. would be next if he did not cooperate. Cruz then ran off with a Black man. R.G. and Marquez gave statements to the police about the incident. Cruz was arrested.

2

A month later, R.G. ran into Cruz in county jail. Cruz told R.G. he would look after R.G. if R.G. did not press charges; but if R.G. did press charges, it would be the "opposite." R.G. was released from jail in March 2020. When he returned to his restaurant, there was graffiti on the wall saying he was a rat. Carlos Osorio, another 18th Street gang member, came to the restaurant and warned R.G. and Marquez not to go to court.

A trial readiness conference was scheduled in Cruz's case for November 5, 2020.

But on the evening of October 5, 2020, which was about one month before that conference was scheduled to occur, Collins shot and killed Marquez across the street from R.G.'s restaurant. Law enforcement was able to trace Collins's steps the day of the murder by searching for GPS devices worn by parolees that might have been in the area when Marquez was killed. This data led to Collins's accomplice Henry Calleros. Using Calleros's GPS information, law enforcement traced his movements before, during, and after Marquez's murder and obtained video surveillance from locations he visited that day.

The information showed that on the morning of October 5, 2020, 18th Street gang member Travon Watson picked up Collins at about 11:00 a.m. in Victorville, where they lived. They drove to Los Angeles and picked up 18th Street gang members Calleros, Santiago Valle, and another man. The vehicle then went to an 18th Street gang stronghold at 54th and Vermont.

About 15 minutes before Marquez was shot, a video was posted to Calleros's social media account showing Calleros, Collins, and Valle in a sports utility vehicle. Collins was in the front passenger seat, and he held a gun. Someone in the car said, "Dieciocho," which is 18 in Spanish. At some point, someone said,

3

" 'Let's roll out,' " and a couple of minutes later, Collins got out of the car.

Video surveillance from a market captured what happened next: Collins exited the vehicle, approached Marquez, and shot him multiple times, killing him.[1]

M.S. and B.R. witnessed the murder. M.S. said a black Tahoe pulled alongside him and Marquez as they were walking. A Black man exited the vehicle with a gun and asked Marquez where he was from. Marquez continued walking, but the man shot Marquez. M.S. said that five people were in the Tahoe. B.R., Marquez's cousin, also said that a black Chevy Tahoe drove up. A Black man "banged on" Marquez, asking where Marquez was from or what was his gang affiliation.

After the shooting, Collins and the others drove to Chinatown, where Collins, Calleros, Valle, and their unidentified accomplice got out the car with a tank of "Nos," nitrous oxide. Collins put on a different shirt, a black tank top. Half an hour later, a car arrived, and the men got in and left.

Nitrous oxide, which is also known as laughing gas, gives a short, euphoric high lasting minutes.

Law enforcement found videos or photos of Calleros and Watson, of Calleros and Osorio, and a "recording of a cell phone playing the surveillance video from the murder" on Calleros's phone.

B.    *Collins's statement*

After Collins was arrested, detectives interviewed him. After initially denying involvement in the crime, Collins admitted he shot Marquez but denied it was his idea to kill Marquez.

---

[1]    The shooter's face cannot be seen in the video.

Collins also denied planning to kill Marquez, and instead thought he and the others were just going to chill that day. But Collins also said, "I did what I did," and when he jumped out of the car, it happened fast. Collins said he was doing Nos "the whole day." The Nos made him feel "weird," and in the moment it was fun, but "I don't know I'm way down here. I keep fallin'," and the Nos "really had me." The "Nos had me fucked up." Everyone was high and "actin' funny." While in the SUV, someone passed up the gun. The others congratulated Collins after the shooting, but he did not think it was "cool."

C. *Gang evidence*

The parties stipulated that 18th Street is a criminal street gang within the meaning of Penal Code[2] sections 186.22, subdivision (a), 186.2, subdivision (b)(1), and 182.5. Officer Henry Canjura testified that he was assigned to monitor the 18th Street gang. He encountered Cruz numerous times, and had seen him with Osorio. Cruz's moniker is Hell Boy. Based on Cruz's tattoos, his self-admissions, and Canjura's contacts with Cruz, Cruz was an active member of the gang and was in charge of patrolling and ensuring that rival gang members did not come into 18th Street territory. Osorio had status in the gang and would be referred to as a big homie.

Officer Yudidt Martinez testified as a gang expert. He had been investigating the 18th Street gang since 2015, and he had worked with the FBI to investigate the gang for the past six years. The 18th Street gang requires businesses in its territory to pay rent in exchange for "permission" and protection from

---

[2] All further undesignated statutory references are to the Penal Code.

other gangs. If a business refuses to pay rent, there can be severe repercussions. R.G.'s restaurant is in the gang's territory and would have been subject to that rent. Speaking to the police can also result in severe consequences. Gang members will use intimidation, threats, and acts of violence to prevent people from testifying.

The officer described Cruz as a foot soldier and enforcer. The officer also testified that Watson, Calleros, and Valle are 18th Street gang members. Officer Martinez had arrested Calleros and Valle numerous times and spoken to them. Osorio, whose moniker is Youngster or Y.G., is a member of the gang and a "bigger homie on the street level." According to the detective investigating Marquez's murder, Osorio ordered Marquez's murder.

In Officer Martinez's opinion, Collins is an 18th Street gang member based on Collins's commission of a crime with other gang members and association with them; for example, the officer reviewed photographs of Collins at a gang party with 18th Street gang members, including Watson. Collins's moniker is Hop Outt. The officer testified that the video taken just before Marquez was shot shows the men hyping each other up.

II.     Jury deliberations, verdict and sentence

Collins, Calleros, Watson, and Valle were charged with murder and participating in a criminal street gang, and Valle was also charged with assault with a semiautomatic firearm. Before trial, Calleros, Watson, and Valle entered into pleas. Watson and Valle pled no contest to assault with a semiautomatic firearm (§ 245, subd. (b)). Calleros pled no contest to voluntary manslaughter (§ 192, subd. (a)) and admitted a gang

6

enhancement (§ 186.22, subd. (a)(1)(C)) and an aggravating factor.

Collins was tried alone, and his jury convicted him of first degree willful, deliberate, and premeditated murder and found a personal gun use allegation true (§§ 187, subd. (a), 12022.5, subd. (a); count 1) and of criminal street gang conspiracy (§ 182.5; count 2). Although Collins's information had alleged four aggravating circumstances (Cal. Rules of Court, rule 4.421(a)(1), (a)(3), (a)(8) & (b)(1)), the jury was not asked to and did not make findings on them.

On April 5, 2024, the trial court sentenced Collins to 25 years to life in prison and to a consecutive upper term of 10 years for the gun enhancement (§ 12022.5, subd. (a)). It imposed the same sentence on count 2, but stayed the sentence.[3]

## DISCUSSION

I.    Instruction on voluntary intoxication

Collins contends that the trial court gave the wrong CALCRIM instruction in response to a question the jury asked about voluntary intoxication and that the error was prejudicial. As we now explain, reversible error did not occur.

A.    *Additional background*

At a conference regarding jury instructions, the defense did not ask for a voluntary intoxication instruction. The trial court therefore did not instruct the jury on that theory but did instruct

---

[3]    At the sentencing hearing, the trial court heard and denied Collins's new trial motion, which argued that CALCRIM No. 3426 was confusing.

7

on first and second degree murder and willful, premeditated, and deliberate murder.

During deliberations, jurors asked, "What is 'careful consideration' defined as?  Should intoxication be a factor to consider with regard to his (defendant's) ability to 'carefully weigh considerations?' "

The trial court told counsel it proposed to respond with the following:  "Please refer to the instructions that I have provided to you.  Words and phrases not specifically defined in the instructions are to be applied using their ordinary, everyday meanings.  (C[ALCRIM No.] 200.)  Please see C[ALCRIM No.] 3426 for an instruction regarding voluntary intoxication."  The trial court then told counsel it had prepared CALCRIM No. 3426 and would read it to the jury.  It explained that it had not originally given the instruction to the jury because it had no sua sponte duty to do so, but, per the instruction's use notes, had to give it on request.  So, "while neither party necessarily requested this instruction, the jurors are asking for an instruction on voluntary intoxication.  The court feels it needs to give the jury guidance with regard to this."  The court asked if its proposal was acceptable, and counsel agreed.

The trial court then read its response and CALCRIM No. 3426 to the jury as follows:

> You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.
>
> You may consider that evidence only in deciding whether the defendant acted with a specific intent or mental state required to do the act required.
>
> A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing

8

that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

> In connection with Count One and Count 2, the People have the burden of proving beyond a reasonable doubt that the defendant acted with a specific intent or mental state required.

> If the People have not met this burden, you must find the defendant not guilty.

> You may not consider evidence of voluntary intoxication for any other purpose.

> Voluntary intoxication is not a defense to implied malice second degree murder.

The trial court did not give CALCRIM No. 625, which is titled "Voluntary Intoxication: Effects on Homicide Crimes (Pen. Code, § 29.4)." That instruction provides:

> You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant _____ <insert other specific intent required in a homicide charge or other charged offense>.]

> A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

> You may not consider evidence of the defendant's voluntary intoxication for any other purpose.

9

B.    *Analysis*

A jury's request for clarification of an instruction triggers section 1138.  (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1015.) Section 1138 provides that if a deliberating jury asks to be informed on any point of law, then " 'the information must be given' " to them.  "This means the trial 'court has a primary duty to help the jury understand the legal principles it is asked to apply.  [Citation.]  This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' "  (*Solis*, at p. 1015; accord, *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 316–317.)

Once a trial court undertakes to instruct a jury on a topic of law, it must do so correctly.  (*People v. Townsel* (2016) 63 Cal.4th 25, 58.)  Nevertheless, "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal."  (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

We review a claim of instructional error de novo.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)  We assess whether the instruction accurately states the law, consider whether there is a reasonable likelihood the instruction caused the jury to misapply the law in violation of the Constitution, and view the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*)  Further, if there is error, its prejudicial nature depends on

10

whether it was reasonably probable the error affected the verdict adversely to the defendant, per *People v. Watson* (1956) 46 Cal.2d 818, 836. (See, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 896–899 [where erroneous voluntary intoxication instruction concerning aider and abettor liability did not violate due process, *Watson* applies].)

Here, we first reject the Attorney General's argument that Collins forfeited any issue on appeal regarding the voluntary intoxication instruction because he did not object to it below. As we have said, once the trial court undertook to instruct the jury, it had to do so correctly. (*People v. Townsel*, *supra*, 63 Cal.4th at p. 58.) A claim that an instruction is incorrect in law does not require an objection to preserve a challenge on appeal. (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) In any event, counsel need not object to an instruction when a defendant's substantial rights are at issue. (§ 1259.) We therefore consider the issue on the merits.

Turning to the merits, evidence of voluntary intoxication is admissible on whether the defendant "actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4; see also *People v. Soto* (2018) 4 Cal.5th 968, 975.) CALCRIM No. 625, which the trial court did not give, expressly instructs the jury that it may consider evidence of a defendant's voluntary intoxication in deciding whether the defendant acted with an intent to kill or with deliberation and premeditation. CALCRIM No. 625's use note states that the instruction is "a specific application of CALCRIM No. 3426, Voluntary Intoxication, to homicide." Thus, CALCRIM No. 625 should be used in murder cases, whereas CALCRIM No. 3426

11

should be used in nonhomicide offenses requiring a specific intent.

The trial court here, however, did not use CALCRIM No. 625 and instead instructed Collins's jury with CALCRIM No. 3426, that it could not consider evidence of his voluntary intoxication "for any other purpose" except whether Collins acted "with a specific intent or mental state required to do the act required." Although the better practice would have been to give CALCRIM No. 625 or to edit CALCRIM No. 3426 to expressly state that evidence of voluntary intoxication is relevant to premeditation, we do not agree that the trial court erred in giving CALCRIM No. 3426 because there is no reasonable likelihood the instruction caused the jury to misapply the law. (See generally *People v. Mitchell*, *supra*, 7 Cal.5th at p. 579.)

*People v. Castillo* (1997) 16 Cal.4th 1009 (*Castillo*) is instructive on this point. In that case, there was evidence the defendant was affected by his use of PCP before committing a murder. The trial court instructed the jury on voluntary intoxication with CALJIC No. 4.21, which provided, " 'In the crimes of murder and attempted murder . . . , a necessary element is the existence in the mind of the perpetrator of the specific intent to kill. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether the defendant had such specific intent or mental state. . . .' " (*Castillo*, at p. 1014, fn. 2.) The court then further instructed with CALJIC No. 4.21.1 that " 'where a specific intent or mental state is an essential element of the crime' " " 'you should consider the defendant's voluntary intoxication in your determination of whether the defendant possessed the required specific intent or

12

mental state at the time of the commission of the alleged crime. [¶] Thus in the crimes of murder and attempted murder . . . a necessary element is the existence in the mind of the defendant of a certain specific intent or mental state which is included in the definition of the crimes set forth elsewhere in these instructions.' " (*Castillo*, at p. 1014, fn. 2.) A jury convicted the defendant of first degree murder where the sole theory was premeditation and deliberation. (*Id.* at p. 1012.)

On appeal, the defendant argued that trial counsel was ineffective "for failing to request a 'pinpoint' jury instruction specifically relating voluntary intoxication to premeditation and deliberation." (*Castillo*, *supra*, 16 Cal.4th at p. 1012.) The court found that no reasonable juror would have understood the instructions to permit it "to consider intoxication in determining whether defendant specifically intended to kill but to prohibit it from considering that same intoxication in determining whether he premeditated and deliberated. Premeditation and deliberation are clearly mental states; no reasonable juror would assume otherwise." (*Id.* at p. 1017.)

We agree with *Castillo* that reasonable jurors would have understood that premeditation is a mental state. Although Collins does not directly address *Castillo*, he argues that the version of CALCRIM No. 3426 given to his jury was different because it referred to the "specific intent or mental state required to do *the act* required." (Italics added.) "The act required" was defined in the murder instruction; that is, murder required proof of (1) an act that caused a person's death and (2) malice aforethought. (CALCRIM No. 520.) Premeditation thus was not an element of murder; instead, premeditation elevates a second degree murder to a first degree murder. (*People v. Prince* (2007)

13

40 Cal.4th 1179, 1266 [murder with malice but without premeditation is of the second degree].)

Collins thus argues that because premeditation was not "required to do the act," the jury would have believed it could not consider voluntary intoxication. However, as in this case, the instructions in *Castillo* also linked specific intent and mental state to the elements of attempted murder and murder, of which premeditation is not one. Yet, the *Castillo* court was unpersuaded that the jury would have thought that premeditation was not a mental state to which voluntary intoxication applied.

In addition, the premeditation instruction given to Collins's jury stated that he was guilty of first degree murder if the People proved "he acted willfully, deliberately, and with premeditation." (CALCRIM No. 521.) The instruction then described the mental processes relevant to premeditation; for example, carefully weighing considerations for and against his choice, knowledge of consequences, and length of deliberation. (CALCRIM No. 521.) Thus, a reasonable reading of the instructions as a whole is that premeditation, a mental state, was required to commit the *act* of *first degree* murder.

Therefore, while the jury would have understood that evidence of voluntary intoxication was relevant to premeditation, any error in giving CALCRIM No. 3426 instead of CALCRIM No. 625 was harmless. First, based on the context in which CALCRIM No. 3426 was given, it is not reasonably probable the jury would have thought the instruction was inapplicable to premeditation. The instruction was not given when the trial court initially instructed the jury before it retired for deliberations. Instead, the trial court gave the instruction in

14

response to the deliberating jury's specific request for clarification of the "careful consideration" language in the premeditation instruction, CALCRIM No. 521. The jury would not have reasonably thought that the trial court would answer its question with an inapplicable instruction. Jurors would have understood that the trial court gave a new instruction, CALCRIM No. 3426, because it affirmatively responded to their question, "Should intoxication be a factor to consider with regard to his (defendant's) ability to 'carefully weigh considerations?" By instructing the jury with CALCRIM No. 3426, the trial court signaled that the jury could consider voluntary intoxication for the purpose of determining whether Collins premeditated.

Also, while the evidence showed that Collins was using nitrous oxide, or Nos, before shooting Marquez, voluntary intoxication is a defense only where the evidence shows intoxication affected the defendant's actual formation of the at-issue mental state. (See *People v. Serrano* (2022) 77 Cal.App.5th 902, 918–918.) Thus, a voluntary intoxication instruction was not warranted when the evidence showed merely that the defendant was " 'probably spaced out,' " " 'doped up,' " and " 'smokin' pretty tough' " when he committed murder. (*People v. Williams* (1997) 16 Cal.4th 635, 677.) Similarly, Collins said the Nos made him feel "weird," like he was "way down here" and "fallin," and it "fucked" him up. However, he also said, "I did what I did," and that everything happened fast.

Moreover, the evidence overwhelmingly showed that Marquez's murder was planned and deliberate: 18th Street gang members had threatened R.G. and Marquez not to testify; Collins and his accomplices drove to R.G.'s restaurant where Marquez worked and lived; and when Collins jumped out of the vehicle, he

issued a gang challenge to Marquez and then shot him multiple times but left Marquez's companion who was standing next to him untouched. Thus, there was little evidence that Collins's use of Nos prevented him from premeditating.

Finally, for the same reasons, we reject Collins's additional contention that any error in failing to instruct the jury with CALCRIM No. 625 prejudiced him as to his conviction for a gang conspiracy in count 2.

II.     Instruction on substantive offense of participation in a criminal street gang

Collins next contends that the trial court failed to instruct the jury on an element of the crime of participation in a criminal street gang, namely, identifying a felony at least two fellow gang members committed. We disagree with this contention; however, we agree with his other contention, that there was insufficient evidence to support his conviction of that crime.

A.     *Legal principles*

Section 182.5, enacted in 2000, "created a new form of conspiracy distinct from the traditional understanding of the crime and was intended to ' "expand[ ] the law on conspiracy to include gang-related activities." ' " (*People v. Abbate* (2020) 58 Cal.App.5th 100, 108.) Section 182.5 thus provides: "Notwithstanding subdivisions (a) or (b) of Section 182, any person who actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, as defined in subdivision (e) of Section 186.22, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of

16

conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182."

A criminal street gang conspiracy differs from a traditional conspiracy in five ways. (*People v. Johnson* (2013) 57 Cal.4th 250, 261–262.) First, the defendant cannot be a stranger to coconspirators; instead, the defendant "must be an active gang participant with knowledge of other members' pattern of criminal gang activity." (*Id.* at p. 262.) Second, while a traditional conspiracy encompasses misdemeanors, a section 182.5 conspiracy requires the commission or attempted commission of a felony. (*Johnson*, at p. 262.) Third, "traditional conspiracy requires both the specific intent to agree, and specific intent to commit a target crime. [Citation.] A [section] 182.5 conspiracy does not require any prior agreement among the conspirators to promote, further, or assist in the commission of a particular target crime. Even without a prior agreement, an active and knowing gang participant who acts with the required intent to promote, further, or assist in the commission of a felony by other gang members can violate section 182.5. That act of assistance or promotion replaces the required prior agreement to commit a crime that is ordinarily at the heart of a traditional conspiracy." (*Ibid.*) Fourth, "traditional conspiracy liability attaches once an overt act is committed. A [section] 182.5 conspiracy requires the actual commission of felonious criminal conduct as either an attempt or a completed crime." (*Ibid.*) And fifth, section 182.5 extends to gang members who merely benefit from crimes committed by other gang members, "even if [the defendant] did not promote, further, or assist in the commission of that particular substantive offense. This constitutes a substantial expansion of a traditional conspiracy application. The 'one who

17

benefits' provision recognizes that gang activities both individually and collectively endanger the public and contribute to the perpetuation of the gang members' continued association for criminal purposes. Due to the organized nature of gangs, active gang participants may benefit from crimes committed by other gang members. When such benefits are proven along with the other elements of the statute, section 182.5 permits those benefitting gang participants to be convicted of conspiracy to commit the specific offense from which they benefitted." (*Johnson*, at p. 262.)

There is no pattern instruction for the offense of participating in a criminal street gang/gang conspiracy under section 182.5, so the trial court here fashioned the following:

> The defendant is charged in Count 2 with "Participation in criminal street gang" in violation of [ ] section 182.5.
>
> The parties have stipulated that 18th Street is a criminal street gang as defined in the law and that the gang participates in a pattern of criminal activity.
>
> In order to prove the crime of "Participation in criminal street gang" in violation of [ ] section 182.5, each of the following elements must be proved:
>
> 1. The defendant actively participated in a criminal street gang;
>
> 2. The defendant had knowledge that its members engage in or have engaged in a pattern of criminal activity; AND
>
> 3. The defendant willfully promotes, furthers, assists or benefits from any felonious criminal conduct by at least two members of the criminal street gang.
>
> Active participation in a criminal street gang means involvement with a criminal street gang in a way that is more than passive or in name only. The

18

phrase, "active participant in a criminal street gang" refers to a person who 1) actively participates in a criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and 2) willfully promotes, furthers, assists, or benefits in any felonious criminal conduct by members of that gang.

To act willfully means to do so knowingly. To prove that the defendant willfully benefitted from any felonious conduct, the People must prove that the defendant knew, expressly or impliedly, that he benefitted from that felonious conduct.

Proving that the defendant benefitted from any felonious conduct does not require proof that the defendant promoted, furthered or assisted in that felonious conduct.

"Felonious criminal conduct" includes the commission of murder, in violation of [ ] section 187.

The crime of "Participation in criminal street gang" does not require evidence of any prior agreement among the conspirators to promote, further or assist in the commission of the felonious criminal conduct in question.

The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved.

The trial court gave the instruction to all counsel to review, and counsel did not object to it.

We independently review claims of instructional error. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.) More generally,

19

"we look to whether the defendant has shown a reasonable likelihood that the jury, considering the instruction complained of in the context of the instructions as a whole and not in isolation, understood that instruction in a manner that violated his constitutional rights. [Citations.] We interpret the instructions so as to support the judgment if they are reasonably susceptible to such interpretation, and we presume jurors can understand and correlate all instructions given." (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' " (*People v. Covarrubias, supra,* 1 Cal.5th at p. 890; *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)

B. *Analysis*

Collins makes two arguments regarding his conviction of this count: (1) the instruction failed to state he could be guilty of violating section 182.5 only if there was proof that at least one other gang member also committed first degree murder, and (2) the evidence was insufficient to support his conviction of that offense. We address each in turn.

First, the instruction the trial court gave here informed jurors that an element of the crime was that at least two gang members engaged in "felonious criminal conduct." The instruction then stated that "felonious criminal conduct"

20

"includes murder" in violation of section 187.  To be sure, the instruction could have been more specific.

In *People v. Ware* (2020) 52 Cal.App.5th 919, 945 (*Ware*),[4] for example, a jury convicted Simpson and two others of gang conspiracy under section 182.5.  As to Simpson, the gang conspiracy was based on a shooting that occurred on April 4, 2012 where two members of Simpson's gang shot a rival gang member.  (*Ware*, at p. 945.)  Simpson's jury was instructed that the prosecution had to prove Simpson willfully promoted, furthered, assisted, or benefited from " '*any felonious criminal conduct*' " by members of that gang.  (*Id.*, at p. 949.)  "Regarding this element, the court further instructed the jury that to find Simpson guilty of gang conspiracy it must find that 'on April 4, 2012, members of the criminal street gang committed Deliberate and Premeditated Attempted Murder in violation of . . . Sections 664/187/189.' " (*Ibid.*)  Accordingly, to "convict Simpson of gang conspiracy, the jury needed to find that the April 4, 2012 shooting was an attempted murder committed by a Brim gang member."[5]  (*Ibid.*)

Although the instruction given to Collins's jury was not as specific as that given in *Ware*, Collins's jury nonetheless would have understood "murder" to refer to the murder of Marquez on October 5, 2020, because it was the only murder on which evidence was presented at Collins's trial.  We therefore do not

---

[4]     Reversed on other grounds by *People v. Ware* (2023) 14 Cal.5th 151.

[5]     The jury was similarly instructed as to codefendant Ware that to find him guilty of gang conspiracy, the jury had to find that on March 25, 2014, members of the criminal street gang committed deliberate and premeditated attempted murder. (*Ware, supra,* 52 Cal.App.5th at p. 947.)

agree that the instruction omitted an element or that there is a reasonable likelihood the jury would have interpreted the instruction in a manner that violated Collins's constitutional rights.

That being said, Collins's second argument that the evidence was insufficient to support that element of gang conspiracy has merit. Again, *Ware* is instructive. In that case, two of Simpson's fellow gang members pled guilty to the murder. (*Ware*, *supra*, 52 Cal.App.5th at pp. 948–949.) However, the nature of their convictions was not presented at Simpson's trial. The court said, "While it is undisputed that Norman Sanchez and Lucas were Brim gang members, there is no evidence in the record regarding to what crime these individuals pleaded guilty, or whether this crime constituted a felony," and it was not within a layperson's common knowledge to make that determination from the testimony. (*Id.* at p. 949.) The court found that without "any evidence regarding the nature of the crimes committed by these Brim gang members the jury is left with speculation," which is not evidence. (*Ibid.*) Given this failure of proof on an element of the crime of gang conspiracy, the court reversed Simpson's conviction of that crime. (*Id.* at p. 950.)

Similarly, the evidence here was insufficient to establish that Valle, Calleros, and Watson murdered Marquez. Rather, Valle and Watson pled no contest to assault with a semiautomatic firearm, and Calleros pled no contest to voluntary manslaughter. Setting aside that the codefendants did not plead to first degree premeditated murder, the People did not introduce any evidence of their pleas and did not make any argument that the crimes to which they did plead satisfied the felonious criminal conduct element of section 182.5.

22

Instead, the jurors were instructed to ignore evidence that others were involved in Marquez's murder. They were instructed that the "evidence shows that other persons may have been involved in the commission of the crimes charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crimes charged." (CALCRIM No. 373.) And in closing argument, the prosecutor discussed the elements of active participation and knowledge the gang engages in a pattern of criminal activity, but he did not address or specify what felonious criminal conduct other 18th Street gang members engaged in. Thus, to the extent the "felonious criminal conduct" 18th Street gang members engaged in was the murder of Marquez, the instructions told jurors not to consider Valle's, Watson's, and Calleros's involvement in it.

We therefore conclude that there was insufficient evidence that Collins participated in a gang conspiracy and reverse Collins's conviction of count 2. Because we reverse that conviction, we need not direct the trial court to correct the abstract of judgment to reflect that the sentence imposed on that count was stayed.

III.   The sentence on the firearm enhancement

Collins contends, and the Attorney General concedes, that the trial court improperly imposed the upper term on the firearm enhancement based on aggravating circumstances not found true by a jury or stipulated to by Collins. Accordingly, the matter must be remanded for resentencing.

23

A.    *Additional background*

The information alleged four aggravating circumstances: the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)); the victim was particularly vulnerable (*id.*, rule 4.421(a)(3)); the way in which the crime was executed indicates planning, sophistication, or professionalism (*id.*, rule 4.421(a)(8)); and the defendant engaged in violent conduct that indicates a serious danger to society (*id.*, rule 4.421(b)(1)).  The record does not show that the trial court asked Collins whether he wanted to waive his right to a trial on the aggravating circumstances.  The aggravating circumstances were not presented to the jury, and it rendered no verdict on them.

Then, at Collins's sentencing hearing, the trial court stated it did not "really have discretion with regard to the sentence.  Since the jury came back with first-degree murder, the sentence is 25 to life, and with a 12022.5 enhancement, that's 10 years.  So I think the sentence is 10 years, plus 25 to life."  The trial court noted that the aggravating circumstances had not been pled or proved to the jury, but "in any event, the court doesn't have discretion to impose a low, high, or midterm for either the gun or count 1, the murder, so the court is not making a ruling on the aggravating factors at this time, as they have no impact on the sentence that applies in this case."  The trial court thus imposed the upper term of 10 years on the firearm enhancement.

B.    *Analysis*

A firearm enhancement under section 12022.5, subdivision (a), carries a sentence of 3, 4 or 10 years.  Where a statute

24

specifies three possible terms, a court shall impose the middle term unless "circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(1) & (2).)

Section 1170 accords with the Sixth Amendment's requirement that virtually any fact that exposes a defendant to a potentially greater sentence must be submitted to a jury and found unanimously and beyond a reasonable doubt. (*People v. Lynch* (2024) 16 Cal.5th 730, 747; *Cunningham v. California* (2007) 549 U.S. 270, 281.) A defendant therefore has a federal constitutional right to jury trial on aggravating circumstances alleged in a charging document, and the right may be waived "by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16.) "When the constitutional right to jury trial is involved, we have required an express waiver even in cases in which the circumstances make it apparent that all involved—the trial court, the prosecutor, defense counsel, and the defendant—assumed that the defendant had waived or intended to waive the right to a jury trial." (*People v. French* (2008) 43 Cal.4th 36, 47.)

Here, the trial court did not obtain Collins's express waiver of jury, and it imposed an upper term on the firearm enhancement on count 1 believing, erroneously, it had no discretion to do otherwise. The trial court, however, had no authority to impose the upper term because the jury had not found any of the aggravating circumstances true and Collins did not stipulate to them.

Such error is reviewed under the *Chapman v. California* (1967) 386 U.S. 18 standard. (*People v. Lynch*, *supra*, 16 Cal.5th at p. 775.) Under that standard, reversal is required "unless, after examining the entire cause, including the evidence as to all relevant circumstances," "we can conclude that the omission of a jury trial was harmless beyond a reasonable doubt as to every aggravating fact the trial court used to justify an upper term sentence." (*Ibid.*)

We cannot make such a conclusion here. Collins never expressly waived his right to a jury trial, and the People never proved the aggravating circumstances to the jury. Moreover, nothing in the record establishes beyond a reasonable doubt that a jury would have found the alleged aggravating circumstances true. It is unclear, for example, what evidence supports that Marquez was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)), and that the crime was committed in a sophisticated or professional manner (*id.*, rule 4.421(a)(8)).

Remand is therefore required for the trial court to comply with section 1170. In the absence of Collins's stipulation to the aggravating circumstances or circumstance, Collins is entitled to a jury trial on them. If Collins waives a jury trial, then he is entitled to a court trial on the aggravating circumstances. (§ 1170, subd. (b)(1) & (2).) If the People decline to proceed on the aggravating circumstances, the trial court shall resentence Collins on count 1, but it may not impose the upper term.

## DISPOSITION

The judgment is reversed as to count 2. The matter is remanded for further proceedings and resentencing as to count 1 in a manner consistent with this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ADAMS, J.

HANASONO, J.